# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN LIFE ASSURANCE COMPANY CANADA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 17-75-LPS |
| | : | |
| U.S. BANK NATIONAL ASSOCIATION, as Securities Intermediary, | : | |
| | : | |
| Defendants. | : | |

Thomas J. Francella, COZEN O'CONNOR, Wilmington, DE

Michael J. Miller, Gregory J. Star, Charles J. Vinicombe, Daniel P. Thiel, COZEN O'CONNOR, Philadelphia, PA

      Attorneys for Plaintiffs


David J. Baldwin, Ryan C. Cicoski, POTTER ANDERSON & CORROON LLP, Wilmington, DE

John E. Failla, Nathan Lander, Elise A. Yablonski, PROSKAUER ROSE LLP, New York, NY

      Attorneys for Defendant U.S. Bank National Association

## <u>MEMORANDUM OPINION</u>

UNSEALED ON
MARCH 4, 2019


February 25, 2019
Wilmington, Delaware



**STARK, U.S. District Judge:**

Plaintiff Sun Life Assurance Company of Canada ("Sun Life" or "Plaintiff") filed this action in January 2017 against U.S. Bank National Association ("U.S. Bank" or "Defendant") and Lindsay Spalding-Jagolinzer ("Spalding"). (D.I. 1)  In its complaint, Plaintiff seeks a declaratory judgment that a Sun Life insurance policy ("the Policy") brokered by Spalding and eventually sold to U.S. Bank lacked an insurable interest at inception and constitutes an illegal human life wagering contract. (D.I. 1 at ¶¶ 39-52)  As such, Sun Life asks the Court to declare the Policy void *ab initio* under Delaware law. (*Id.* at 17)[1]  Based on a settlement, the claims against Spalding have since been dismissed with prejudice. (D.I. 180)

Presently before the Court are Plaintiff's and Defendant's cross-motions for partial summary judgment. (D.I. 131, 135)  For the reasons set forth below, the Court will grant Plaintiff's motion deny Defendant's motion.[2]

## I.  BACKGROUND

Spalding is a Miami-based insurance agent who was appointed by several carriers to sell life insurance policies. (D.I. 130-2, Spalding Dep. at 15, 31-32, 40-43)  In particular, she had a "Sales Representative Agreement" with Sun Life, whereby she would solicit applications for Sun Life policies in exchange for a fee. (*Id.* at 42-43, 149; D.I. 130-3 at 140-46 (A576-82))  Between 2005 and 2008, Spalding also worked with Coventry Capital Partners ("Coventry") on behalf of

---

[1] The Court has subject-matter jurisdiction by reason of complete diversity pursuant to 28 U.S.C. § 1332.

[2] Other motions are pending as well, including each party's motion to strike proposed expert testimony proffered by the other side. (*See* D.I. 133, 138)  Those motions do not impact the issues being decided in this Memorandum Opinion.  Additionally, a jury trial is scheduled to begin on March 11.  By a separate Order being issued today, the Court will confer with the parties as to whether the remaining motions still require resolution and as to whether there remains a need for the March trial.

her clients to finance the premiums those clients had to pay on life insurance policies Spalding

helped them obtain. (D.I. 130-2, Spalding Dep. at 15, 85-87, 95)  Coventry's terms for agents

and prospective insureds, including all rates and fees, were non-negotiable. (*Id.* at 119-20)  Any

time Spalding originated a policy financed by Coventry, she and Coventry split the commission

50-50. (*Id.* at 160)  Spalding did not, however, have an exclusive arrangement with Coventry, so

she would generally contact several premium finance companies on behalf of her clients. (*Id.* at

120)

      In late 2005, Harriet Sol, then aged 71, was referred to Spalding for the purpose of

securing a life insurance policy. (*Id.* at 51-52)  During their initial phone conversation, Spalding

and Sol discussed life insurance options, including the concept of premium financing. (*Id.* at 54-

56)  Spalding informed Sol that in order to secure premium financing, Sol needed to have a net

worth over $5 million; Sol indicated that she wanted to pursue premium financing. (*Id.*)  Sol

allegedly claimed that her net worth was about $10 million and that she had an annual household

income of over $200,000, and Spalding apparently accepted these statements as true. (*Id.* at 89-

90, 142, 147-48)  Spalding then obtained Sol's medical records, compiled an informal

application, and submitted the application and records to Sun Life to secure a tentative offer for a

policy. (*Id.* at 63-65)  Sun Life made such an offer in late January 2006. (*Id.* at 65, 173-74)

      Within days of receiving the offer, Spalding's company, Spalding Financial Group

("SFG"), obtained life expectancy reports on Sol. (D.I. 132-15; D.I. 132-16)  A few months

later, Coventry obtained its own independent life expectancy report on Sol. (D.I. 132-17)

Spalding has testified in deposition that her regular practice is to obtain such reports for any

client over the age of 70, and that the reports are useful for clients who may consider selling their

policy on the secondary market. (D.I. 132-3 at 79-82)

In February 2006, Spalding received a Coventry Loan Proposal through Coventry's Premium Financing Program, offering Sol non-recourse premium financing. (D.I. 132-18) Spalding describes non-recourse premium financing as an option for individuals who do not want to be exposed to the risk of repaying a loan, since the policy being purchased with the loan is pledged as the sole collateral, capping the maximum amount of the borrower's loss at the value of the policy. (D.I. 132-3 at 88-89) For Sol's premium financing, Coventry enlisted LaSalle Bank National Association ("LaSalle") to serve as the lender. (D.I. 130-2, Spalding Dep. at 99, 149, 166; D.I. 130-3 at 185-90 (A621-26)) Coventry's initial Loan Proposal was for premium financing on a $5 million Sun Life policy, proposing that the borrower be the then non-existent Harriet Sol 2006 Family Trust, Premium Finance Sub-Trust. (D.I. 132-3 at 89; *see also* D.I. 132-18; D.I. 132-19) Subsequently, the Loan Proposal was increased, in contemplation of Sol acquiring a $10 million Sun Life policy instead of $5 million. (D.I. 132-3 at 93-94)

Sol eventually executed a series of trust agreements. Sol first established the Harriet Sol Irrevocable Insurance Trust ("Insurance Trust"), naming her daughter Jacqueline Sol ("Jacqueline") as the trustee and her husband and descendants – excluding her son, Allen Sol – as beneficiaries. (D.I. 132-22 at 26 (COVCAP584)) The Insurance Trust Agreement did not disclose any specific property being held in trust. (*Id.*) ("I have delivered or will deliver certain assets to the Trustee.")

The Insurance Trust then created the Harriet Sol 2006 Family Trust ("Family Trust"), naming the Wilmington Trust Company ("WTC") as trustee and Sol's daughter Jacqueline as co-trustee, with the Insurance Trust as beneficiary. (*Id.* at 5) The Family Trust was nominally funded with $1.00. (*Id.*)

3

The Insurance Trust also established the Harriet Sol 2006 Family Trust, Premium Finance Sub-Trust ("Sub-Trust") to secure premium financing for the life insurance policy. (*Id.* at 13, 24) As with the Family Trust, the Sub-Trust's trustees were WTC and Jacqueline and its beneficiary was the Insurance Trust. (*Id.* at 24)

With the Insurance Trust, Family Trust, and Sub-Trust (collectively, the "Trusts") in place, Jacqueline, on behalf of the Insurance Trust, entered into a Settlor Non-Recourse Security Agreement ("Security Agreement") with LaSalle, pledging the Family Trust and Sub-Trust as collateral for a loan to purchase a $10 million life insurance policy. (*Id.* at 41-45) Pursuant to the Security Agreement, LaSalle agreed to provide non-recourse premium financing via a loan to the Sub-Trust in exchange for a note providing LaSalle an exclusive beneficial ownership interest in the Family Trust and Sub-Trust (as well as any assets, such as the Policy, held therein) should the loan default. (*Id.*) Coventry was named the servicing agent under the Security Agreement. (*Id.* at 42) Coventry was also granted an irrevocable durable power of attorney with respect to Sol regarding any policies owned by the Family Trust and Sub-Trust, the release of her medical records, and the originating or servicing of any life insurance policies in her name. (*Id.* at 47, 59)

WTC, on behalf of the Sub-Trust, then executed a separate Note and Security Agreement ("Note Agreement") with LaSalle, which constituted the loan agreement between LaSalle and the Sub-Trust. (D.I. 132-26) Coventry again was named as the servicing agent of the Note Agreement. (D.I. 132-26 at 5 (COVCAP31)) The Note Agreement called for a 26-month loan of $355,000 to the Sub-Trust with an interest rate of 17.24%, plus a $10,262.92 "Origination Fee" and $5,142.70 "Trust Administration Fee." (*Id.* at 10) In total, then, the premium finance agreement required payments of $508,764.47 at maturity. (*Id.*) The Sub-Trust would have to

pay back (or refinance) that amount in 26 months or the loan would go into default and the

Policy, which was pledged as collateral, would be seized by LaSalle and/or Coventry.

Once the financing was secured, on March 30, 2006 Maria Lacayo, an SFG employee,

submitted a formal application to Sun Life for a $10 million life insurance policy. (D.I. 132-27)

The application designated Harriet Sol as the insured and the Family Trust as the policy owner

and beneficiary. (*Id.* at 5-7 (SunLife52-54)) The application represented that Sol had a net

worth of $10 million, an annual household income of over $200,000, and that the payor of the

premium was the same as the owner of the policy, i.e., the Family Trust. (*Id.* at 7-8) Spalding

certified that the answers provided in the application were "complete and true to the best of [her]

knowledge." (*Id.* at 11)

As part of the subsequent underwriting process, Sun Life sought to verify Sol's financial

information. (D.I. 132-3 at 176-77; D.I. 132-9 at 254-56) To that end, SFG enlisted an outside

vendor, Infolink, to prepare an inspection report. (D.I. 132-14; D.I. 132-29) SFG's Lacayo sent

the Infolink inspector, Jewel Sutton (formerly Jewel Strader), an e-mail summarizing Sol's

purported finances, but without any supporting documentation. (D.I. 132-29; D.I. 132-31 at 74-

78) While Sutton claimed it is "unusual" for an agent to provide her the insured's financial

information directly and she would typically disregard it, she also admits that in this case the

information in her report matches exactly the information provided by SFG: that Sol had an

annual income of over $200,000 and a net worth of $10 million. (D.I. 132-14; D.I. 132-29; D.I.

132-31 at 77, 92-95)

Upon receiving the inspection report, Sun Life requested further justification for a $10

million policy. (D.I. 132-32 at 8 (SunLife43)) Spalding responded that the estate planned to

grow at a rate of 6% annually, resulting in a total estate of over $20 million by the end of Sol's

14-year life expectancy, thereby justifying a $10 million policy (after a 50% discount). (*Id.* at 7) Sun Life then approved the application (*id.* at 2), which was issued on May 12, 2006, with a Policy date of June 4, 2006 (D.I. 132-33). One week later, Sun Life received a wire transfer for the initial premium payment of $355,000. (D.I. 132-34)

As the 26-month maturity date on the Coventry/LaSalle loan approached, Spalding began exploring bridge loans,[3] to provide Spalding sufficient time to sell Sol's policy on Sol's behalf on the secondary market. (D.I. 132-3 at 196-99) Spalding and Sol eventually secured a bridge loan from W Capital Partners, LLC ("W Capital") and, soon thereafter, Sol's policy was sold on the secondary market to Life Settlement Solutions ("LSS") for $700,000. (*Id.* at 198-201; D.I. 132-36; D.I. 132-37) Of those proceeds, $508,764.47 was paid to W Capital to pay off the bridge loan (which had been used to pay Coventry/LaSalle the $508,764.47 owed for the original loan) and the remaining $191,235.53 was paid to Isidore Sol, Sol's husband. (D.I. 132-38; D.I. 132-39) LSS later sold the Policy to another entity before it was finally acquired by Defendant U.S. Bank in May 2009. (D.I. 137-2 Ex. 25 at 11, Ex. 35)

Sol died on November 21, 2016. (*Id.* Ex. 38) U.S. Bank then filed a claim under the Policy with Sun Life. (*Id.*) However, by no later than May 10, 2007, Sun Life had become aware of Coventry's premium financing operations, which Sun Life considered to be part of a scheme to foster the issuance of Stranger-Owned Life Insurance ("STOLI") policies,[4] and Sun

---

[3] A bridge loan is a short-term loan. According to Spalding, Sol required a bridge loan because policies cannot be settled until they are in force for 24 months. (D.I. 132-3 at 31, 196-99) Since Sol had been approved for only a 26-month premium finance loan, in the absence of a bridge loan Spalding and Coventry would have had little time (i.e., two months) to perform due diligence and sell the Policy. (*Id.*)

[4] STOLI policies involve "speculators collaborat[ing] with an individual to obtain a life insurance policy in the name of that individual and then sell[ing] some or all of the death benefit payable upon the death of the insured to stranger investors." *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 550 (D. Del. 2010). In essence, STOLI policies are a wager on the

Life had at that time begun barring applications associated with Coventry. (D.I. 130-2, Foley Dep. at 109-10 (A212-13); D.I. 130-3 at A438-42) Sun Life further identified a series of "flags" that its underwriters should look for before approving policy applications that may be STOLI. (D.I. 130-3 at A437) Additionally, Sun Life had copied Spalding on an e-mail dated January 26, 2006 (prior to the submission of Sol's application) stating, "Sun Life does not accept non recourse premium financed business. If premium financed we would need complete details." (D.I. 132-32 at 13 (SunLife78)) By at least 2009, Sun Life had specifically placed Sol's Policy on a suspected STOLI list. (D.I. 130-2, Lawrence Dep. at 89-90 (A23-24))[5]

Thus, after Sol's death, Sun Life, instead of paying U.S. Bank's claim, initiated a death claim investigation. (D.I. 132-10 at 138-41) As part of that investigation, Sun Life learned that Sol could not afford the premiums on her policy. (D.I. 132-41 at 9-10 (¶16)) In fact, according to her son, Richard, Sol had previously entered into bankruptcy and had been financially

---

insured's life; "the sooner the insured dies, the more profit these stranger investors are positioned to reap." *Id.*

[5] The circumstances surrounding this case (and others like it) are more complicated than they might initially appear. Under Delaware law, "[t]he secondary market for life insurance is perfectly legal." *PHL Variable Ins. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011); *see also id.* at 1074 ("[T]he insurable interest requirement does not place any restrictions of the subsequent sale or transfer of a bona fide life insurance policy. . . . [A] life insurance policy that is validly issued is assignable to anyone, with or without an insurable interest, at any time."). Given the existence of such a secondary market, each of the players in it is, naturally, incentivized to act in a manner most likely to redound to its financial benefit. Thus, an insurance company (such as Plaintiff) has a financial incentive to sell policies and to collect (often large) premiums on such policies for as long as possible, even after it may have strong reason to believe that a particular policy was a STOLI and void at its inception, as the insurance company may hope it can retain all the premiums it collects and face little or no risk of ever having to pay a claim on the allegedly unlawful policy. Meanwhile, the agents, lenders, and purchasers on the other side of these transactions (such as Defendant) have a financial interest to fund and place as many of these policies as they can (and for amounts as large as possible), to collect (often large) fees and interest, and – if they later come to own the policies themselves – to wager that the likelihood of collecting the large policy proceeds more than offsets the amount it will pay in premiums and the risk of a judicial finding that the policies are unenforceable.

7

dependent on him since approximately 2000-2001.  (*Id.*; D.I. 132-6 at 19-30)  Considering Sol's

Policy to be an illegal STOLI policy, Sun Life commenced this action.

## II.    LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  The moving party bears the burden

of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  An assertion that a fact cannot

be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials," or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) &

(B).  If the moving party has carried its burden, the nonmovant must then "come forward with

specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 587

(internal quotation marks omitted).  The Court will "draw all reasonable inferences in favor of

the nonmoving party, and it may not make credibility determinations or weigh the evidence."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than

simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*,

475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)

(stating party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

"Sun Life and U.S. Bank both agree that the fundamental issue of whether the Sun Life [P]olicy insuring the life of Harriet Sol (the 'Policy') is void *ab* initio can be resolved by this Court, as a matter of law, on Sun Life's and U.S. Bank's cross-motions for summary judgment." (D.I. 168 at 1) Specifically, Sun Life moves for partial summary judgment to void Sol's life insurance Policy as an illegal wager that lacked an insurable interest at inception. (*See* D.I. 132) U.S. Bank cross-moves for partial summary judgment on the basis that the Policy was a legal contract which Sun Life breached by failing to pay out the Policy claim. (*See* D.I. 136) The Court concludes that there are no genuine disputes of material fact and that: (i) the Policy lacked

an insurable interest at inception and is void *ab initio* as an illegal wager, and (ii) Sun Life did

not breach its contract by failing to pay out the claim.

The Delaware Constitution "prohibits all forms of gambling unless it falls within one of

the enumerated exceptions." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d

1059, 1070-71 (Del. 2011) ("*Dawe*"); *see also* Del. Const., art. II, § 17.[6] "For nearly one

hundred years, Delaware law has required an insurable interest as a way to distinguish between

insurance and wagering contracts." *Dawe*, 28 A.3d at 1071. "[I]f a life insurance policy lacks an

insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public

policy against wagering." *Id.* at 1068.

A life insurance policy has an insurable interest if: (1) a person procures insurance on his

or her own life for the benefit of anyone; or (2) any person procures insurance on the life of the

insured, so long as "the benefits are payable to one holding an insurable interest in the insured's

life." *Id.* at 1073-74. An individual has an insurable interest in another with whom he or she has

a close relation by blood or law or in whom he or she has a substantial economic interest. *See*

18 Del. C. § 2704(c)(1). The insurable interest must exist at the time the contract was made, but

need not exist during "the subsequent sale or transfer of a bona fide life insurance policy."

*Dawe*, 28 A.3d at 1074.

To determine who procured a policy, Delaware law requires courts to "scrutinize the

circumstances under which the policy was issued." *Id.* at 1076. One significant factor is who

pays the premiums; if the premiums are paid by the insured, that is "strong evidence" that the

transaction is bona fide. *Id.* By contrast, "if a third party funds the premium payments by

---

[6] It is undisputed that Delaware law applies here.

10

providing the insured the financial means to purchase the policy then the insured does not procure or affect the policy." *Id.* However, as another Judge of this Court has concluded, interpreting *Dawe*, an insured may legitimately borrow money to pay for the premiums, so long as there is an "obligation to repay." *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 869 F.Supp.2d 556, 563 (D. Del. 2012) ("*Dawe* does not foreclose an insured from borrowing money to pay for premiums. An insured's ability to procure a policy is not limited to paying the premiums with his own funds; borrowing money with an obligation to repay would also qualify as an insured procuring a policy.").

One key limitation that always applies is "that the insured take out the policy in good faith – not as a cover for a wagering contract," because without such good faith the transaction does not involve "[a] bona fide insurance policy sale or assignment." *Id.* at 1075. As the Delaware Supreme Court has stated: "An insured's right to take out a policy with the intent to immediately transfer the policy is not unqualified. That right is limited to bona fide sales of that policy taken out in good faith." *Id.*

In this case, there is no genuine dispute as to whether Sol procured the Policy: a reasonable juror, taking the evidence in the light most favorable to U.S. Bank, could only find that Sol did ***not*** procure the Policy.[7] It is undisputed that the Sol did not pay the premiums herself, with funds she had prior to the series of transactions relating to issuance of the Policy.

U.S. Bank argues, nonetheless, that Sol procured the Policy by obtaining a loan from Coventry/LaSalle that she had a contractual obligation to repay and which, ultimately, she did

---

[7] The Court agrees with the parties that, under the circumstances of this case, the Court can decide this question on the record, without the need to bring in a jury to resolve issues of fact. *See Dawe*, 28 A.3d at 1076 (instructing "***courts*** to . . . determine who in fact procured or effected the policy") (emphasis added).

11

repay. (D.I. 136 at 12)  The undisputed facts show, however, that Sol did not have a genuine obligation to repay the full amount of the Coventry/LaSalle loan.  One reason for this conclusion is that it was not actually Sol, but instead the Sub-Trust, which was the borrower on the loan (as well as being the holder of the Policy).  (D.I. 132-22 at 24 (COVCAP582))  The Sub-Trust, then, owed the obligation to repay the loan, not Sol (the insured).  (*See* D.I. 132-22 at 41-42 (COVCAP599-600) (stating Security Agreement committing Sub-Trust as collateral is between Insurance Trust (not Sol) and LaSalle, and "[i]f the Sub-Trust fails to pay the amount due under the Note Agreement . . . we may take the Collateral from you [i.e., from the Sub-Trust]"); D.I. 132-26 (setting forth LaSalle's interest in Sub-Trust and terms of default in Note Agreement); D.I. 181 at 38 ("the subtrust was the borrower"))  Thus, Sol herself did not have any personal obligation to repay the loan.

Even if Sol is considered the borrower, the non-recourse nature of the loan meant that neither she nor the Sub-Trust had an "obligation to repay" sufficient to support a conclusion that Sol actually "procured" the Policy.  Pursuant to the non-recourse nature of the loan, LaSalle secured an interest in the Policy (via the Trusts) as collateral but had no ability to collect monies from Sol or the Trusts beyond the value of the collateral, i.e., the value of the Policy.  (D.I. 132-3 at 118; D.I. 132-18 at 5; D.I. 132-22 at 41 (COVCAP559); D.I. 132-34)  Consequently, it is undisputed that Sol could never have been personally liable to repay the loan.  (D.I. 132-3 at 118; D.I. 181 at 14, 40)  In other words, had the Sub-Trust (or even Sol) defaulted, the only loss to the Sub-Trust (and Sol) would have been its interest in the Policy, a policy that would not have existed but for the loan.  (D.I. 132-18 at 5; D.I. 132-22 at 41; D.I. 132-34; D.I. 181 at 40)

A reasonable juror would also have to conclude that Sol lacked the practical ability to repay the loan using anything other than proceeds from transfer of the Policy.  (D.I. 132-3 at 228

(Spalding testifying that Policy's annual premiums were double Sol's allegedly inflated salary); D.I. 132-6 at 19-30 (Sol's son testifying as to her "dismal" finances at time she took out Policy); D.I. 132-7)  While Defendant argues that "there is a dispute only because [her son] did not have complete knowledge of her factual circumstances" (D.I. 181 at 39), Defendant provides no financial statements, testimony, or other evidence to support its suggestion that Sol could have repaid the loan without selling the Policy.  On the record before the Court, there simply is no genuine dispute that Sol could not have repaid the loan without the proceeds of the Policy.

In sum, by not paying the premiums herself and by not undertaking a personal obligation to repay the premiums, Sol did not procure the Policy and did not provide the Policy's insurable interest at inception.  Even if the Sub-Trust had a contractual obligation to repay, and Sol and the Trusts could be considered one-and-the-same, the obligation to repay was nothing more than a cover, as the loan was non-recourse and the undisputed facts show that neither Sol nor the Sub-Trust had the practical ability to repay using anything other than the proceeds of the Policy.

This same conclusion has been reached by two other courts applying Delaware law to cases involving similar facts – including Coventry contracts.  In *U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 2016 WL 8116141, at *2, 17 (E.D.N.Y Aug 30, 2016) ("*Van de Wetering*"), the Court concluded that the insured did not procure a policy when using non-recourse financing to pay the premiums, because non-recourse financing imposed no obligation to repay the loan.  Likewise, the Court in *Sun Life Assurance Company of Canada v. U.S. Bank National Association* ("*Malkin*"), 2016 WL 161598, at *16-18 (S.D. Fla. Jan. 14, 2016), *aff'd in part, rev'd in part and remanded*, 693 F. App'x 838 (11th Cir. 2017), found that while the

13

insured did have an explicit contractual obligation to repay, the insured's practical inability to pay proved that the insured had not procured the policy at issue.  *Id.*[8]

Rucker, a case relied on by U.S. Bank, does not support a different result.  There a genuine dispute existed as to whether the policy broker loaned money for premium payments in his individual capacity, creating a true obligation for the insured to repay, or merely acted as a middleman for a third-party investor, suggesting that the policy at issue lacked an insurable interest.  *See* 869 F.Supp.2d at 563-64.  Here, there is no such dispute.  LaSalle, a third-party investor, indisputably provided the funds for the initial premium payments and, as the Court has explained, a reasonable juror could only find that Sol, the insured, had no true obligation to repay the loan.

In the alternative, Defendant points to others besides Sol who may have had an insurable interest in the Policy at its inception.  For instance, Defendant points to the Trusts Sol created to hold the Policy and to handle premium payments.  (D.I. 136 at 12-13)  In cases in which a trust is involved, "*Dawe* instructs the court to assess whether the trust was actually created and funded by the insured, as opposed to the trust being established to effect a wager." *Rucker*, 869 F.Supp.2d at 565; *see also Dawe*, 28 A.3d at 1076 (holding that trustee has insurable interest in life of insured so long as insured "actually established the trust").  The insured, as the settlor or grantor of the trust, "must both create and initially fund the trust corpus.  This requirement is not

---

[8] The Court does not agree with Sun Life that U.S. Bank is collaterally estopped from asserting that the Sol Policy is valid based on the *Malkin* and *Van de Wetering* Courts ruling in favor of Sun Life and against U.S. Bank.  (*See* D.I. 132 at 23-24)  Under Delaware law, each policy must be scrutinized in the context of its particular circumstances, *see Dawe*, 28 A.3d at 1076, notwithstanding similarities one policy may share with another already considered by a court.  Here, then, "the identical issue" presented was not "previously adjudicated," so collateral estoppel is inapplicable.  *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006); *see also* D.I. 153 at 32-34.

satisfied if the trust is created through nominal funding as a mere formality" or if the funding is provided, directly or indirectly, by a third party through a pre-negotiated agreement. *Dawe*, 28 A.3d at 1078.

Here, the parties do not dispute that the Trusts were either funded nominally ($1.00) or with funds provided by third parties as part of a pre-negotiated arrangement (i.e., the Coventry/LaSalle premium finance loan to permit purchase of the Policy).[9] (*See* D.I. 132-22 at 5 (COVCAP563), 26, 41-45; D.I. 132-26) Thus, the trustees did not have an insurable interest in the insured's life at the Policy's inception.

U.S. Bank also argues that Sol's family had an insurable interest at the time of the Policy's inception, as they were the beneficiaries of the Insurance Trust. (D.I. 136 at 12-13) (citing 18 Del. C. § 2704(a)) In U.S. Bank's view, then, Sun Life is inviting the Court to commit legal error by asking it to disregard the insurable interest of Sol's family. (D.I. 181 at 69-70) This argument, too, is unavailing.

The Court has already concluded that Sol did not procure the Policy, so the Policy must have been procured by another. Pursuant to 18 Del. C. § 2704(a), another person may procure an insurance contract upon the life of an individual, such as Sol, but only if "the benefits under such contract are payable" to Sol, to Sol's "personal representatives," or "to a person having, at the time when such contract was made, an insurable interest in" Sol. *See generally Dawe*, 28 A.3d at 1073 ("Section 2704(a) has two parts."). Here, Defendant encourages the Court to find the Policy valid and enforceable based on the last of these options, contending that the benefits of

---

[9] It is also undisputed that there was ***no*** pre-arrangement for Coventry to purchase the Policy from Sol or the Trusts. As discussed below, however, there is a substantial dispute as to the relevance of this fact.

the Policy were, at the time the Policy was issued, payable to individuals having "an insurable

interest" in Sol. To assess this contention, the Court must examine 18 Del. C. § 2704(c), which

defines "insurable interest." *See generally Dawe*, 28 A.3d at 1078 ("[A] life insurance policy

procured or effected without an insurable interest is a wager on the life of the insured and is

prohibited by the Delaware Constitution.").

The pertinent portions of § 2704(c) are reproduced below:

> "Insurable interest" as to such personal insurance means
> that every individual has an insurable interest in the life, body and
> health of himself or herself and a person has an insurable interest
> in the life, body and health of other individuals as follows:
>
> (1) In the case of individuals related closely by blood or by law, a
> substantial interest engendered by love and affection;
>
> (2) In the case of other persons, a lawful and substantial economic
> interest in having the life, health or bodily safety of the individual
> insured continue, as distinguished from an interest which would
> arise only by, or would be enhanced in value by, the death,
> disablement or injury of the individual insured; [and]
>
> . . .
>
> (5) The trustee of a trust created and initially funded by an
> individual has an insurable interest in the life of that individual and
> the same insurable interest in the life of any other individual as
> does any person who is treated as the owner of such trust for
> federal income tax purposes without regard to:
>
> > (a) The identity of the trust beneficiaries;
> >
> > (b) Whether the identity of the trust beneficiaries changes
> > from time to time; and
> >
> > (c) The means by which any trust beneficiary acquires a
> > beneficial interest in the trust.

The Court will assume, arguendo, that Defendant is correct that the Policy here

technically complies with the statutory language of § 2704(a) and (c)(1): a third party (SFG,

16

Coventry, and/or LaSalle) procured an insurance contract upon the life of another (Sol), with the benefits payable to a person (Sol's named family members) having an insurable interest (in Sol), in this case pursuant to § 2704(c)(1) ("individuals related closely by blood"). But technical compliance does not end the inquiry.

As the Delaware Supreme Court has stated:

> The insurable interest requirement serves the substantive goal of preventing speculation on human life. For this reason, **section 2704(a) requires more than just technical compliance** at the time of issuance. Indeed, the STOLI schemes are designed to feign technical compliance with insurable interest statutes.

*Dawe*, 28 A.3d at 1074 (emphasis added). Likewise, **Section 2704(c)**, too, "requires **more** than just technical compliance with section 2704(a), otherwise § 2704(c)[] would expressly authorize wagering contracts" in certain situations, which would be a result at odds with – and expressly prohibited by – the Delaware Constitution. *Dawe*, 28 A.3d at 1078 (emphasis added); *see also id.* at 1070 ("The plain language of 18 *Del. C.* § 2704(a) is ambiguous because a literal reading of the statute would permit wagering contracts, which are prohibited by the Delaware Constitution."); Del. Const., art. II, § 17 ("All forms of gambling are prohibited in this State except the following [i.e., a list of four exceptions not including STOLI] . . . ."). Thus, as explained in *Dawe*, the Court must "interpret section 2704(c) in light of section 2704(a) to create harmony within the statute." 28 A.3d at 1076-77; *see also id.* at 1071 ("Because a literal reading of the statute creates an absurd result not contemplated by the General Assembly, we must interpret the statute in conformity with both Delaware law and the General Assembly's intent.").

While *Dawe* was specifically concerned with § 2704(c)(5), all of subsection (c) must be reconciled with § 2704(a), for "[p]arties cannot use section 2704(c) . . . to do indirectly what 2704(a) clearly prohibits parties from doing directly." *Id.* at 1078. Just as *Dawe* found that

"section 2704(c)(5) would expressly authorize wagering contracts, so long as it was conducted through a trust for whom the insured was the settlor or grantor," *id.*, here too, the Court finds that § 2704(c)(1) would expressly authorize wagering contracts, so long as a policy or trust names at inception a beneficiary having an insurable interest in the life of the insured. But, just as *Dawe* held that the former outcome is not permissible under Delaware law, so, too, here the Court must conclude that the latter outcome is impermissible as well.

Instead, to create harmony between § 2704(a) and (c)(1), the Court concludes that when all other facts point to the procurement of an illegal wagering contract in violation of § 2704(a), merely naming a beneficiary having an insurable interest does not make an otherwise unlawful wagering contract lawful. "[E]ither the individual insured" or the third party "must intend to purchase the policy for lawful insurance purposes, and not as a cover for a wagering contract." *Id.* In other words, the parties involved must procure the Policy in good faith. *See id.* at 1075 ("A bona fide insurance policy sale or assignment requires that the insured take out the policy in good faith – not as a cover for a wagering contract."). Where they do not, the policy is not a valid insurance policy.

On the record before the Court, taking the evidence in the light most favorable to Defendant, a reasonable factfinder could only find that the third parties – Coventry, LaSalle, and/or SFG – did not act in good faith. *See generally DV Realty Advisors LLC v. Policemen's Annuity and Ben. Fund of Chicago*, 75 A.3d 101, 108 (Del. 2013) ("The ultimate determination that a party acted in good faith is a legal issue."). This conclusion is based on at least the following, none of which (on the record before the Court) is in genuine dispute: (1) Sol's application contained material misrepresentations as to her finances and who would be paying the premiums (D.I. 132-3 at 228; D.I. 132-6 at 19-30; D.I. 132-7); (2) all of the third parties

18

failed to perform adequate due diligence of (and may have willfully ignored) Sol's finances (D.I.

132-3 at 142; D.I. 132-29; D.I. 132-31 at 74-78); (3) Coventry sought its own pre-application

independent life-expectancy report of Sol (D.I. 132-17); (4) the premium finance loan was non-

recourse (D.I. 132-22 at 41 (COVCAP599)); (5) Sol and the Trusts lacked the practical ability to

pay the premiums or repay the loan using anything but the proceeds from the Policy (D.I. 132-3

at 228; D.I. 132-6 at 19-30; D.I. 132-7); (6) Coventry secured an irrevocable appointment of

power of attorney over any life insurance policy owned by the Trusts, and to originate other

policies in Sol's name (D.I. 132-22 at 47 (COVCAP605), 59 (COVCAP617)); and (7) the entire

arrangement presented a win-win situation for Coventry and its lending associates, as discussed

in further detail below.

 Against all this, the only fact the Court can discern in the record that a reasonable

factfinder might view as supporting a finding that the Policy may have been taken out in good

faith as an insurance policy, as opposed to being a cover for a wager, is that Sol explicitly

excluded one of her sons, Allen, from being a beneficiary of the Insurance Trust.  (D.I. 132-22 at

26 (COVCAP584); *see also* D.I. 132-6 at 18-21 (Sol's son Richard testifying that his brother,

Allen, "ran up a tremendous amount of debt" in their father's name, resulting in their parents'

bankruptcy))  Arguably, this fact suggests that Sol viewed the Policy as property in which she

had a real interest, and viewed her (family) beneficiaries as true beneficiaries, and, hence,

exercised control over which family members (all of whom had an insurable interest in Sol)

should obtain some or all of the value of the Policy.  Even accepting that there is support for such

a finding, the Court remains of the view that the only conclusion that can be reached based on

the complete record is that the third parties did not act in good faith.

There are several reasons for this conclusion.  First, it is not apparent that the Court should even look to Sol's intent, as she did not procure the Policy.  Second, as Spalding acknowledged, a policy must be in force for at least 24 months before it may be sold on the secondary market (as purchasers do not wish to buy a policy that is still contestable).  (D.I. 132-3 at 199; *see also* 18 Del. C. § 2908)  That within this contestable period the third parties allowed Sol to say who she would and would not want to obtain the Policy proceeds is simply part of the gamble the third parties were taking; had Sol died in that 24-month period, the third parties would have recouped their investment plus substantial interest and fees, but they would not have had a chance to also collect the Policy proceeds (which in that instance would have gone to Sol's designated beneficiaries).  This limited opportunity for individuals with a legitimate insurable interest in Sol to obtain the Policy proceeds does not establish, as a matter of law or fact, that the third parties were acting in good faith.  Instead, merely naming Sol's family members as beneficiaries who would be paid if the third-parties' wager did not "pay off" as hoped – if Sol were to have died before the Policy was sold on the secondary market – does not render the Policy legal under § 2704(a), notwithstanding the technical compliance of such an arrangement with § 2704(c)(1).  After all, ***somebody*** had to be named as beneficiary during the contestable period.

Finally, the Court rejects U.S. Bank's wholly unpersuasive argument that "Sun Life's entire case unravels based on one simple, undisputed fact – ***Coventry never acquired the Policy from Ms. Sol.***"  (D.I. 153 at 21) (emphasis added)  Defendant repeatedly asserts that the Policy cannot be a "cover for a wager" under *Dawe* because none of the parties involved in procuring the Policy ended up acquiring the Policy, and the parties had no prior arrangement for any of them to do so.  (*See, e.g.*, D.I. 136 at 13-14; D.I. 153 at 3, 19-20, 27-28)  Defendants' efforts to

point to any place in *Dawe* in which the Delaware Supreme Court establishes this as a prerequisite for a policy to be a STOLI are unavailing. All of the statements on which Defendants rely are non-exhaustive, non-limiting descriptions of the facts the Court was considering in *Dawe*.[10] There, it was undisputed that the third parties involved in procuring the policy for the insured were also, by pre-arrangement, the same parties that would eventually come to purchase the policy from the insured. Similarly, while both *Van de Wetering* and *Malkin* involved situations in which Coventry at one point took possession of the policies, *see* 2016 WL 8116141, at *7; 2016 WL 161598, at *7, nothing in these opinions, either, persuades the Court that the correct interpretation of Delaware law is to treat the presence or absence of such a fact as dispositive.

Nor has Defendant identified a persuasive reason as to why, under Delaware law, the legality of the Policy should turn on whether the third party procuring the policy is also the same third party that will acquire the policy on the secondary market. Instead, the Court agrees with Sun Life that "*Dawe* precludes strangers from procuring policies for strangers. It would turn [] *Dawe* on its head to take U.S. Bank's invitation to create a loophole where a stranger cannot create a policy for itself, but can do so for a different stranger." (D.I. 168 at 5)

In this regard, it is noteworthy that, were the Court to agree with Defendant's position, the result would be a "win-win situation" for Coventry and its associates; no matter when the

---

[10] For instance, *Dawe* states: "In cases where a third party either directly or indirectly funds the premium payments ***as part of a pre-negotiated arrangement with the insured to immediately transfer ownership***, the policy fails at its inception for lack of an insurable interest." 28 A.3d at 1078 (emphasis added). The Court does not read in this portion of *Dawe* (or any other) a view that so long as there is ***not*** "a pre-negotiated arrangement . . . to immediately transfer ownership" then the arrangement is necessarily lawful and enforceable. Instead, a life insurance policy in the latter category must be "scrutinized" in the context of its circumstances to enable a court to make a correct assessment, just as the Court has done here.

insured dies, or no matter who purchases the policy on the secondary market, Coventry and/or its associates would be guaranteed to profit. If the insured allowed the loan to default, or if Coventry (or an associate, such as Defendant) elected to purchase the policy, Coventry (or its associate) would then enter the wager on the insured's life, and collect the policy proceeds whenever the insured dies. Alternatively, if the insured dies during the 24-month contestability period, or if the insured outlives the contestability period and the policy is sold to a disinterested third party on the secondary market, Coventry and/or its associates are still guaranteed a substantial return from the loan fees and interest they collect. Having the legality of the insurance policy depend on whether there is a prearrangement as to whom to sell a policy would do nothing to further Delaware's constitutionally-enshrined policy prohibiting life wager contracts.

Moreover, taking a wider view, facts of which the Court may take judicial notice demonstrate that Coventry, with the help of U.S. Bank, established and directed a program to increase the number of high-value life insurance policies available on the secondary market. (D.I. 132-2 at 5 (LAV3467563)) Coventry arranged financing for numerous individuals – at least some of whom appear to have been financially strained – to procure high-value life insurance policies with little to no risk to the individuals. (*See generally* D.I. 132-6 at 19-30; D.I. 132-7; *see also generally Van de Wetering*, 2016 WL 8116141, at *17; *Malkin*, 2016 WL 161598, at *17) In exchange for its services, Coventry (or its contracting lenders) charged high fees and interest rates on the short-term loans used to pay the policies' premiums. (D.I. 132-18 at 5 (COVCAP24)) In this context, no persuasive reason has been identified for how or why Delaware law makes an otherwise unlawful STOLI policy somehow lawful simply because a

party that contributed substantially to creating a market for such policies has no plan necessarily to acquire the particular policy before the Court.

In sum, after scrutinizing the circumstances under which the Policy was issued, the Court concludes that the Policy lacked an insurable interest at its inception and, thus, is void *ab initio* under Delaware law.

## IV.    CONCLUSION

For the reasons set forth above, Sun Life's motion for partial summary judgment will be granted and U.S. Bank's motion for partial summary judgment will be denied. The Court will confer with the parties on whether there is still a need for trial on other issues and to obtain additional briefing on whether the premium payments may be retained by Sun Life or must be returned to U.S. Bank. An appropriate order follows.